1
2
3
4
5
6
7
8          # UNITED STATES DISTRICT COURT
9                  EASTERN DISTRICT OF CALIFORNIA
10
    BRIAN KEITH RANDRUP,
11                                              Case No.  1:16-cv-00436-SKO
              Plaintiff,
12
         v.                                     ORDER ON PLAINTIFF'S SOCIAL
13                                              SECURITY COMPLAINT
    NANCY A. BERRYHILL,
14  Acting Commissioner of Social Security,[1]

15            Defendant.                        (Doc. 1)

16

17  _____/
18

19

20                      **I.      INTRODUCTION**

21       On March 28, 2016, Plaintiff Brian Keith Randrup ("Plaintiff") filed a complaint under

22  42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner

23  of Social Security (the "Commissioner" or "Defendant") denying his application for

24  Supplemental Security Income (SSI).  (Doc. 1.)  The matter is currently before the Court on the

25  parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K.

26  _____

27  [1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of the Social Security Administration.
    *See* https://www.ssa.gov/agency/commissioner.html (last visited by the court on February 27, 2017).  She is therefore
    substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20
28  C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper
    defendant").

1 Oberto, United States Magistrate Judge.[2]

2 **II.    BACKGROUND**

3     On December 3 and 9, 2011, Plaintiff filed claims for DIB and SSI payments,

4 respectively, alleging he became disabled on December 8, 2009, due to "Chronic neck pain and

5 panic disorder," "Degenerative Bone Disease," "Arthritis," "Chronic Back/Neck Pain," "Bone

6 Spur at C-5," "Panic Attics" [sic], "Pain Management Treatment," "High Blood Pressure," and

7 "High Cholesterol." (Administrative Record ("AR") 11, 63, 67, 80, 119, 135, 262–65.) Plaintiff

8 was born on October 29, 1965, and was 44 years old on the alleged disability onset date. (AR 19,

9 31.) Plaintiff completed the eleventh grade and obtained his GED. (AR 32–33.) From 1983–

10 2007 and 2008–2009, Plaintiff was an estimator in a construction business. (AR 295.) Plaintiff

11 also was an adjuster of insurance homeowner claims from 2005–2006. (AR 295.)

12 **A.    Relevant Medical Evidence[3]**

13     In 2003, Plaintiff was moving a hot tub into a pickup when his assistants dropped it

14 causing Plaintiff to bear the hot tub's full weight. (AR 367.) An MRI apparently demonstrated

15 that Plaintiff suffered a herniated disc, for which he underwent an anterior "Cloward procedure."

16 (AR 367.) The procedure dissipated Plaintiff's symptoms in his hand and pain in his arm, but he

17 continued to have "persistent" pain in his posterior left shoulder. (AR 367.)

18     Plaintiff's medical records from May 2009 indicate his neck symptoms were "stable," he

19 was prescribed Norco, he would be monitored for complications, and he was "doing well in

20 general." (AR 359–60.) In November 2009, Plaintiff was noted to have restriction of joint

21 motion, joint pain, and joint tenderness with no muscle complaints, and his neck symptoms had

22 "worsened." (AR 354.) Plaintiff was given a new prescription for Norco. (AR 354.) On

23 December 18, 2009, Plaintiff was observed to have a normal neck examination, a normal gait,

24 station and balance, and his head and neck normal to inspection and palpation, with painless

25 range of motion of the neck. (AR 352.) A history of cervical spine fusion was noted. (AR 351.)

26     On December 22, 2009, treating physician John F. Kirby, M.D., noted that Plaintiff's

27
28

---

[2]  The parties consented to the jurisdiction of a U.S. Magistrate Judge. (Docs. 7,9.)
[3] As Plaintiff's assertion of error is limited to the ALJ's consideration of his alleged physical (as opposed to mental) impairments, only evidence relevant to those arguments is set forth below.

Norco medicine regimen was "effective" and that Plaintiff relayed the Norco "worked well." (AR 367.) Dr. Kirby's physical examination revealed that Plaintiff was "in no acute distress" with normal sensory examination. (AR 367.) Dr. Kirby noted "some, but not striking, posterior cervical discomfort and some discomfort to palpation of the rhomboids." (AR 367.) Plaintiff was recommended to resume his "Norco/Soma regimen" and instructed to take hydrocodone as well. (AR 367.) On February 2, 2010, Dr. Kirby observed that Plaintiff had used Norco "to good benefit" and "is able to remain active and perform [activities of daily living] and vocational tasks," and in August 2010, noted that Plaintiff was "at home caring for wife with cardiac and neural issues." (AR 601.) Dr. Kirby noted in December 2010 that Plaintiff's regimen of 8 Norco per day "yielded adequate pain relief for his ongoing cervical and trapezius complaints." (AR 604.) Dr. Kirby's examination showed intact reflexes and "modestly tender trapezius and cervical paraspinals." (AR 604.)

In March 2011, Plaintiff reported to Dr. Kirby that he was "alright," with interscapular back pain "essentially present 24/7 with some fluctuation" and rhomboid tenderness. (AR 603.) On June 20, 2011, Dr. Kirby noted that Plaintiff "cares for [his] wife" and was experiencing steady, interscapular pain, and rhomboid and lumbar tenderness. (AR 603.) On June 26, 2011, Plaintiff was involved in an auto accident and was taken to the hospital and seen relative to injuries to his upper back, head, and shoulder area. (AR 398–99, 407.) The day after the accident, Plaintiff was evaluated and assessed with multiple soft tissue injuries. (AR 407.) He was referred to a trauma group for further evaluation. (AR 407.)

On September 19, 2011, Plaintiff saw Dr. Kirby, who noted musculoskeletal pain. (AR 603.) Dr. Kirby completed a medical source statement on October 5, 2011, wherein he opined that, in an 8-hour workday, Plaintiff could stand and walk 6 hours and sit 6 hours; frequently lift and carry 10 pounds; rarely lift and carry 20 pounds; frequently perform fingering, grasping, and handling; and rarely stoop or crouch. (AR 602.) Dr. Kirby opined further that Plaintiff's pain would occasionally interfere with the attention and concentration needed to perform even simple work tasks, and that Plaintiff's impairments or treatment would cause him to be absent from work about four days per month. (AR 602.)

On October 11, 2011, Plaintiff presented to neurosurgeon Justin Paquette, M.D. regarding Plaintiff's auto accident injuries. (AR 412.) Plaintiff complained of neck pain (9 out of 10), back pain (8 out of 10), and left arm numbness, and indicated he was taking Norco for pain and Soma for muscle spasms. (AR 412.) Dr. Paquette observed Plaintiff's neck range of motion was 75% normal and worse with extension, with direct pain on palpation at the cervicothoracic junction and muscle spasms present. (AR 413.) Plaintiff's sensation was "slightly diminished over left C5 dermatomal distribution, otherwise intact," and Plaintiff was "able to ambulate throughout with his own power." (AR 413.) Dr. Paquette reviewed a CT of Plaintiff's cervical spine, which showed prior cervical facet fusion and anterior osteophytes at C5–6, loss of disc space height, and bone spurring causing some mild encroachment in the C4–5 foramen. (AR 414.) Dr. Paquette requested an MRI, and recommended physical therapy, core muscle strengthening, and acupuncture. (AR 414.) He noted that should conservative options fail, Plaintiff would be a good candidate for facet joint injections and epidurals or, ultimately, surgery. (AR 414.)

An MRI of Plaintiff's cervical spine was performed on November 29, 2011, which showed postsurgical changes from the anterior cervical discectomy and fusion at the C6–7 level, with anterior screw and plate fixation hardware and solid bony fusion. (AR 420–21.) The MRI also showed a 2 mm broad-based posterior protrusion with a predominantly left paracentral component at the C5–6 level, causing mild spinal canal stenosis. (AR 421.) Bilateral uncovertebral ridging was also present at C5–6, which caused mild bilateral neural foraminal narrowing. (AR 421.)

In November 2011, Plaintiff established care with Primary Care Consultants, Inc. and was seen by treating Nurse Practitioner Pamela Rico. (AR 457–62.) Plaintiff indicated he had not seen a primary care physician, had been out of medication for two years, and requested Xanax for anxiety. (AR 457.) Plaintiff complained of back pain, stiffness, arthritis and loss of strength. (AR 447–48, 459.) Plaintiff denied muscle cramps, joint pain, joint swelling, muscle weakness, gout, muscle aches, and the presence of joint fluid. (AR 447–48, 459.) Nurse Practitioner Rico found Plaintiff in no acute distress, and observed tenderness to palpation to cervical spine with mild paravertebral spasms and mild weakness to Plaintiff's left thumb. (AR 448–49, 459–60.)

She found no deformity or scoliosis of thoracic or lumbar spine. (AR 460.) Plaintiff was observed to have hypertension, anxiety, hyperlipidemia, and back pain, and was indicated to be taking Norco and Soma for pain management. (AR 450, 458, 461.) In December 2011, Plaintiff presented to Nurse Practitioner Rico complaining of joint pain, back pain, stiffness, and muscle aches. (AR 438, 440.) Plaintiff's physical exam again noted tenderness to palpation to cervical spine with mild paravertebral spasms. (AR 440.)

On January 14, 2012, Plaintiff was seen again by Nurse Practitioner Rico. Plaintiff indicated he was "waiting for uc davis [sic] referral for his neck," is no longer a patient of Dr. Kirby, and was interested in "adding a long acting medication with the Norco." (AR 431.) Plaintiff complained of muscle cramps, back pain, and stiffness, and he denied joint pain, joint swelling, muscle weakness, arthritis, gout, loss of strength, muscle aches, and presence of joint fluid. (AR 434.) He was prescribed Norco, Soma, Xanax, and a blood glucose monitor for his recently-diagnosed diabetes. (AR 436.) In March 2012, Nurse Practitioner Rico observed Plaintiff's neck pain had "improved" and that Plaintiff was continuing to take Norco and Soma. (AR 591.)

In March 2012, state agency physician N. Shibuya, M.D., reviewed the record and concluded that, in an 8-hour workday, Plaintiff could stand and walk 6 hours, and sit 6 hours. (AR 88–89.) Plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; frequently climb ramps, stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds. (AR 88.)

Nurse Practitioner Rico's treatment notes from May–November 2012 indicate Plaintiff's neck and back pain had improved. (AR 526–27, 533, 540, 547, 557, 564, 570, 577.) In December 2012, Plaintiff reported to Nurse Practitioner Rico that he went to UC Davis and "they are going to do injections, follow up in 3 months and then decide if surgery is necessary. (AR 515.) Nurse Practitioner Rico observed that Plaintiff's neck pain was unchanged, but his back pain had improved. (AR 519.)

In January 2013, state agency physician J. Mitchell, M.D., reviewed the record and concluded, consistent with Dr. Shibuya, that Plaintiff could stand and walk 6 hours, and sit 6

hours in an 8-hour workday.  (AR 146–48.)  Plaintiff could occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; frequently climb ramps, stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds.  (AR 146–47.)

Plaintiff received a steroid injection for neck pain in February 2013, which he reported "did nothing."  (AR 501.)  In March 2013, Plaintiff complained of back pain and stated that Norco was "no longer working for him" and that it wore off in about an hour.  (AR 494, 497.)  Plaintiff was prescribed Percocet for pain.  (AR 496.)  Nurse Practitioner Linda Jasels completed an In-Home Supportive Services (IHSS) Program Health Care Certification Form on March 22, 2013, wherein she indicated that Plaintiff was unable to independently perform one or more activities of daily living and recommended him for IHSS services.  (AR 482.)  She also indicated Plaintiff was not able to lift more than 10 pounds.  (AR 482.)

Plaintiff saw Nurse Practitioner Rico again in April 2013, and indicated he "did not do well on the Percocet" as it "did nothing for him."   (AR 487.)  Plaintiff requested to resume taking Norco.  (AR 487.)  Plaintiff reported suffering "worsening pain" and "severe" neck pain.  (AR 487.)  He indicated he is "being scheduled for surgery at UC Davis for fusion of the c-spine."  (AR 487.)  Nurse Practitioner Rico found moderate to severe tenderness to palpation to cervical spine and mild to moderate paravertebral spasms along Plaintiff's spinal cord.  (AR 490.)  That same month, Plaintiff saw Gary Critser, D.O., who observed that Plaintiff "was in no apparent distress" and was "sitting with ease."  (AR 595.)  Dr. Critser's treatment notes indicate Plaintiff reported an ability to "function alright" with medication.  (AR 593.)  In December 2013, Plaintiff was seen by cardiologist Surinder S. Sandhu, M.D., who noted that Plaintiff was "active around the house, does have some musculoskeletal issues and is on pain medication."  (AR 619.)

On April 2, 2014, Nurse Practitioner Rico completed a medical source statement, wherein she opined that, in an 8-hour workday, Plaintiff could stand and walk less than 2 hours and sit less than 2 hours, and required a position that permitted shifting positions at will.  (AR 622.)  Nurse Practitioner Rico opined that Plaintiff could stand for 15 minutes at a time and sit for 45 minutes at a time, must walk from 10–15 minutes every hour, and would occasionally need to take 10 minute unscheduled breaks.  (AR 622–23.)  Plaintiff could occasionally lift and carry less

than 10 pounds; rarely lift and carry up to 20 pounds; and occasionally twist, stoop, bend, crouch, and climb stairs. (AR 623.) Nurse Practitioner Rico opined that, in an 8-hour workday, Plaintiff could reach overhead 50% of the time; reach in front 80% of the time; perform fine manipulation with the fingers 80% of the time with his left hand; and grasp, turn, and twist objects 80% of the time with his left hand. (AR 623.) Plaintiff was likely to be off-task 20% of the time, was capable of low stress work, and was likely to be absent from work due to his impairments or treatment more than four days per month. (AR 624.)

**B.      Plaintiff's Statement**

On January 16 and October 20, 2012, Plaintiff completed adult function reports. (AR 302–09, 318–26.) Plaintiff indicated he lives in a house with his parents. (AR 302, 318.) When asked to describe what he did from the time he wakes up to the time he goes to bed, Plaintiff responded "sit and lay on bed" and "attempt to make myself comfortable." (AR 302, 319.) Plaintiff stated that

> pain, panic attacks and medications make it impossible for me to perform at the workplace. I can not [sic] do any physical labor nor can I concentrate on paperwork. I have a clouded mind and memory loss. I am in constant agony.

(AR 318) He indicated that his parents and a caregiver "check on" him and his wife, and perform the shopping and cooking. (AR 303, 319.) Plaintiff indicated that he has no problem with personal care. (AR 303, 319.) He responded that he wakes up in pain. (AR 303, 319.) Plaintiff responded he has to be reminded to take showers. (AR 304, 319.) Plaintiff reported he does not prepare his own meals or perform housework due to pain. (AR 304–05, 320–21.) Plaintiff stated he goes outside daily onto his porch and drives a car, but needs assistance with tasks. (AR 305, 321.) Plaintiff indicated that he does not do any shopping. (AR 305, 321.) Plaintiff is able to pay bills, count change, handle a savings account, and use a checkbook/money orders. (AR 305, 321.) Plaintiff reported his hobby was "R/C cars," which he does on weekends and "well."[4] (AR 306.) He spends time with others, having friends visit and speaking with family on the phone once a week to two times a month. (AR 306, 322.) Plaintiff indicated that he does not need to be reminded to go places, but that he needs someone to accompany him. (AR 306, 322.) He

---

[4] Elsewhere in his reports, however, Plaintiff indicated he no longer engages in that activity. (AR 306, 322.)

reported that his impairments affect lifting, walking, and stair-climbing, in that he can only lift 5 pounds, walk 100 yards without taking a 5-minute rest, and climb 5 steps.  (AR 323.)  Plaintiff indicated that he takes Norco, Soma, and Xanax, all of which have the side effect of "clouded mind."  (AR 325.)

## C.    Administrative Proceedings

Plaintiff filed applications for DIB and SSI payments on December 3 and 9, 2011, respectively, alleging he became disabled on December 8, 2009.  (AR 11, 63, 67, 80, 119, 135, 262–65.)  The Social Security Administration denied Plaintiff's applications for benefits initially on April 30, 2012, and again on reconsideration on February 13, 2013.  (AR 178–82, 197–201.)  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 203–12.)  On April 22, 2014, Plaintiff appeared with counsel and testified before an ALJ.  (AR 27–62.)

### 1.    Plaintiff's Testimony

Plaintiff testified the highest level of education he completed was eleventh grade and that he obtained his GED.  (AR 32–33.)  Plaintiff said he lives with his wife in a "fifth wheel."  (AR 32.)  Plaintiff testified that he was driven to the hearing by his parents and that he could not have driven himself due to having taken medication.  (AR 32.)

Plaintiff testified that on his alleged disability onset date, he was working for Lindall Construction writing estimates for construction in an office setting.  (AR 33.)  Prior to Lindall Construction, Plaintiff worked for his family business as an estimator and, prior to that, as a house painter.  (AR 33–34.  Plaintiff testified that he "got through" his last job at Lindall Construction by "taking extra medication," and that he stopped working there because the pain and stress became "too great."  (AR 35.)  Plaintiff stated that if his family company had not closed, he would have continued to work there, but he would need special accommodations.  (AR 35–36.)

Plaintiff testified that "there's no way I can see myself committing to a job eight hours a day because of the amount of pain I'm in.  Not without totally being medicated way above where I would need to be."  (AR 35.)  Plaintiff stated that he has pain in his back, neck, and left

shoulder radiating down to his left arm into his fingers.  (AR 35.)  Plaintiff testified his current neck pain is "all the time."  (AR 36.)  The radiating pain occurs every day, causing weakness in his left forearm and affecting Plaintiff's ability to use his left arm.  (AR 39.)  Plaintiff testified that "being active," meaning "taking a shower . . . regular…daily activities," and cold weather aggravates the pain.  (AR 38–39.)

Plaintiff testified that he takes pain medication to treat his pain, which helps but does not take the pain away completely.  (AR 40.)  Without medication, Plaintiff rated his pain at a 9 out of 10, and, with medication, at a 7.  (AR 41.)  He stated he suffers side effects of sleepiness with the medication.  (AR 41.)  Plaintiff testified he tried heating packs, ice, and physical therapy, none of which helped the pain.  (AR 41.)  Plaintiff had two anterior discectomies in 2003, which helped the pain, and in May 2013, which did not help.  (AR 36, 42, 46.)  Plaintiff stated that his physicians have recommended additional surgery on two more discs.  (AR 46.)

Plaintiff stated he can move his head and touch his chin to his shoulder, side-to-side, "with difficulty."  (AR 38.)  He could hold his head steady for 10 minutes before taking a 10-minute break.  (AR 40.)  Plaintiff testified he could reach overhead and out in front of him with his left arm with great difficulty, but could not do that repetitively.  (AR 40.)  Plaintiff testified he could do those same motions with his right arm "to some degree."  (AR 40.)  He testified the longest he could sit in a chair is 30 to 45 minutes, and the longest he could stand is 20 or 30 minutes.  (AR 44.)  Plaintiff said he could walk a half a block before stopping, and could lift a gallon of milk with both hands and with the left hand only "with great difficulty."  (AR 44.)  Plaintiff testified that he can perform the following "with great difficulty": bend to pick something up off the ground, squat, and kneel.  (AR 44.)  Plaintiff cannot climb a flight of stairs without pausing.  (AR 44.)

Plaintiff testified that he does not cook or clean, but that he does go grocery shopping if accompanied and will drive to the store.  (AR 46–47.)  He stated that he only drives three or four times a month because he cannot take his medication when he drives.  (AR 47.)  Plaintiff can dress himself, which causes pain, and also bathe himself.  (AR 48.)  Plaintiff testified that he does not currently help care for his wife, who has a IHSS caregiver, and that he did not help care for

her in the past. (AR 53.) He wakes up in pain about every hour and is "pretty much in bed 12 hours a day." (AR 49.) Plaintiff elevates his feet and legs about half of the time while lying down, which helps. (AR 49.) He testified that he currently has no hobbies or interests, but that in the past he had wrestled, water skied, snow skied, and played in a rock and roll band, all which he no longer does due to his neck injury. (AR 47–48.)

## 2. Vocational Expert's Testimony

The Vocational Expert ("VE") identified Plaintiff's past work as a construction estimator, Dictionary of Operational Titles (DOT) code 169.267-038, which was skilled, light exertional work as performed, with a specific vocational preparation (SVP)[5] of 7; and as a claims adjuster, which was skilled, light exertional work, with a SVP of 6. (AR 55–56.) The ALJ asked the VE to consider a person of Plaintiff's age, education, and with his past jobs. (AR 56.) The VE was also to assume this person is limited to performing work at the light exertional level, but cannot climb ladders, ropes, and scaffolds; can perform other postural maneuvers such as stooping, crouching, and crawling on an occasional basis; can frequently perform handling, fingering, and feeling; is limited to performing only simple, routine tasks with limited public contact; and must avoid concentrated exposure to hazards such as unprotected heights and moving machinery. (AR 56.) The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other work in the national economy as an garment sorter, DOT code 222.687-014, light exertion level and SVP 2; garment bagger, DOT code 920.687-018, light exertion level and SVP 1; and marker, DOT code 369.687-026, light exertion level and SVP 2. (AR 57.)

The ALJ asked a follow up question regarding the first hypothetical worker who was also limited to lifting and carrying up to 10 pounds on an occasional basis. (AR 58.) The VE testified that such a person could perform work in a production assembly job, DOT code 734.687-018, sedentary exertion level and SVP 2; leaf tier, DOT code 529.687-138, sedentary exertion level and SVP 1; and ampoule sealer, DOT code 559.687-014, sedentary exertion level and SVP 2.

---

[5] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

(AR 58.)  When asked by the ALJ if the same person would require frequent, unscheduled breaks, resulting in being off task about 25 percent of the time, the VE testified that there would be no work such person could perform.  (AR 58.)  The VE testified that her testimony was consistent with the DOT.  (AR 59.)

Plaintiff's counsel asked the VE to consider an individual who could stand and walk 6 hours; sit 6 hours; frequently lift 10 pounds and less; rarely lift 20 pounds; never lift 50 pounds, frequently finger, grasp, and handle; rarely stoop, bend, or crouch; occasionally have problems with attention and concentration during the workday; and that the individual would miss about four days of work per month.  (AR 59.)  The VE testified that no jobs were available for that person.  (AR 59.)  Plaintiff's counsel asked the VE to consider another hypothetical person who could sit 45 minutes at a time; stand 15 minutes at a time; sit less than 2 hours; stand/walk less than 2 hours; occasionally lift less than 10 pounds; rarely lift 10 or 20 pounds; never lift 50 pounds; occasionally twist, stop, bend, crouch, squat, climb stairs; and rarely climb ladders. (AR 60.)  The VE testified that no jobs were available for that person.  (AR 60.)  Finally, Plaintiff's counsel asked the VE to consider the same hypothetical person as posed in the ALJ's first hypothetical, but with the added limitation that the person would need an additional break during the day of approximately one hour.  (AR 60.)  The VE testified that, given that "accommodation," normally there would be no jobs in the open economy available for that person.  (AR 60.)

**D.    The ALJ's Decision**

In a decision dated August 1, 2014, the ALJ found that Plaintiff was not disabled.  (AR 11–21.)  The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920.  (AR 13–20.)  The ALJ decided that Plaintiff has not engaged in substantial gainful activity since December 8, 2009, the alleged onset date (step 1).  (AR 13.)  The ALJ found that Plaintiff had the severe impairments of (1) degenerative disc disease, (2) diabetes mellitus, (3) obesity, (4) obstructive sleep apnea, (5) hypertension, (6) major depressive disorder; and (7) anxiety disorder (step 2).  (AR 13.)  However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step 3).  (AR 14–15.)  The ALJ determined that Plaintiff had the

residual functional capacity ("RFC")[6]

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [Plaintiff] can lift and carry 10 pounds occasionally and frequently and cannot climb ladders, ropes, or scaffolds. He can frequently handle, finger, and feel and occasionally perform postural activities, but he must avoid concentrated exposure to hazards. Mentally [Plaintiff] can perform simple routine tasks with limited public contact.

(AR 15.)

The ALJ determined that Plaintiff had was unable to perform any of his past relevant work (step 4), but that Plaintiff was not disabled because, given his RFC, he could perform a significant number of other jobs in the local and national economies, specifically assembly, leaf tier, and ampoule sealer (step 5). (AR 19–20.) In reaching his conclusions, the ALJ also determined that Plaintiff's subjective complaints were not fully credible. (AR 17.)

### III.    SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the

---

[6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## IV.    APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he or she is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.    42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)–(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.    20 C.F.R. §§ 404.1520(b), 416.920(b).   If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting him from performing basic work activities. *Id*. §§ 404.1520(c), 416.920(c).  If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id*. §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform his past work. *Id*. §§ 404.1520(f), 416.920(f).  If not, in Step Five, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id*. §§ 404.1520(g),

416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## V.  DISCUSSION

Plaintiff contends that the ALJ erred in discounting the opinions of Plaintiff's treating physician Dr. Kirby and treating Nurse Practitioner Rico, and in failing to resolve an apparent conflict in the VE's testimony. (Doc. 15 at 14–18; Doc. 17 at 2–6.) The Commissioner contends that the ALJ provided specific and legitimate reasons supported by substantial evidence to reject, in part, Dr. Kirby's opinion, and that the ALJ properly discounted Nurse Practitioner Rico's opinions. (Doc. 16 at 6–8.) The Commissioner asserts further that the ALJ properly relied on the VE's testimony. (*Id.* at 8–9.)

### A.  The ALJ Properly Rejected a Portion of the Opinion of Treating Physician Dr. Kirby, But Committed Error in Rejecting the Opinion of Nurse Practitioner Rico.

#### 1.  Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.; Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996). "To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions." *Cooper v. Astrue*, No. CIV S–08–1859 KJM, 2010 WL 1286729, at *2 (E.D. Cal. Mar. 29, 2010). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate" reasons, and those reasons must be supported by substantial evidence in the record. *Id.* at 830–31; *accord Valentine v.*

*Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings.'" *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

"[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). If an ALJ opts to not give a treating physician's opinion controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c)(2)(i)–(ii) and (c)(3)–(6) in determining how much weight to give the opinion. These factors include: length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii), (c)(3)–(6).

**2.    The ALJ Did Not Err in Rejecting Part of the Opinion of Treating Physician Dr. Kirby.**

Plaintiff contends that treating physician Dr. Kirby's opinion is "uncontradicted," and therefore the Commissioner must articulate "clear and convincing reasons based on substantial evidence" in rejecting that opinion. (Doc. 15 at 14.) Dr. Kirby's opinion, however, is not uncontradicted. Although not specifically identified by the ALJ as a basis for its rejection, Dr. Kirby's opinion is contradicted by the medical opinion evidence of state agency medical consultants Drs. Shibuya and Mitchell, who, as the ALJ noted, opined that Plaintiff could stand and walk 6 hours; sit 6 hours; occasionally lift and carry 20 pounds; frequently lift and carry 10 pounds; frequently climb ramps, stairs, balance, stoop, kneel, crouch, and crawl; and occasionally climb ladders, ropes, and scaffolds, with no other limitations. (AR 19, 88–89, 146–48.) Thus, the ALJ was required to state "specific and legitimate" reasons, supported by substantial evidence, for rejecting part of Dr. Kirby's opinion. In reviewing the medical

evidence and rejecting Dr. Kirby's medical source opinion, the ALJ stated:

> This opinion is given only partial weight, as the expected absences are not supported by Dr. Kirby's treatment notes, indicating [Plaintiff] was able to remain active and independently perform activities of daily living, and was caring for his wife.

(AR 17 (citing AR 601, 603).) The ALJ properly rejected Dr. Kirby's opinion that Plaintiff would be expected to miss about four days of work per month because this opinion was inconsistent with Dr. Kirby's own treatment notes. *See Ghanim v. Colvin,* 763 F.3d 1154, 1161 (9th Cir. 2014) ("A conflict between treatment notes and a treating provider's opinions may constitute an adequate reason to discredit the opinions of a treating physician or another treating provider.") (citations omitted); *Valentine,* 574 F.3d at 692–93 (contradiction between treating physician's opinion and his treatment notes constitutes specific and legitimate reason for rejecting opinion); *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005) (same); *Rollins v. Massanari,* 261 F.3d 853, 856 (9th Cir. 2001) (ALJ properly rejected the opinion of treating physician, where treating physician's opinion was inconsistent with his own examination and notes of claimant); *Connett v. Barnhart,* 340 F.3d 871, 875 (9th Cir. 2003) (a treating physician's opinion is properly rejected where the treating physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]"); *Tonapetyan v. Halter,* 242 F.3d 1144, 1149 (9th Cir. 2001) (finding that the ALJ properly rejected the opinion of a treating physician since it was not supported by treatment notes or objective medical findings); *Teleten v. Colvin,* No. 2:14-CV-2140-EFB, 2016 WL 1267989, at *5–6 (E.D. Cal. Mar. 31, 2016) ("An ALJ may reject a treating physician's opinion that is inconsistent with other medical evidence, including the physician's own treatment notes.") (citing *Tommasetti v. Astrue,* 533 F.3d 1035, 1041 (9th Cir. 2008); *Bayliss,* 427 F.3d at 1216); *Khounesavatdy v. Astrue,* 549 F. Supp. 2d 1218, 1229 (E.D. Cal. 2008) ("[I]t is established that it is appropriate for an ALJ to consider the absence of supporting findings, and the inconsistency of conclusions with the physician's own findings, in rejecting a physician's opinion.") (citing *Johnson v. Shalala,* 60 F.3d 1428, 1432–33 (9th Cir. 1995)).

As the ALJ noted, Dr. Kirby's treatment notes from 2010 indicate that while Plaintiff

experienced musculoskeletal pain, he had used Norco "to good benefit" and "is able to remain active and perform [activities of daily living] and vocational tasks," including "caring for [his] wife with cardiac and neural issues." (AR 15, 17, 601.) In March and June 2011, Plaintiff reported to Dr. Kirby that he was "alright," albeit still complaining of pain, and continues to "care[] for [his] wife." (AR 17, 603.) Such findings fail to support Dr. Kirby's opinion that Plaintiff was so significantly impaired by his physical impairments that he must miss about four days of work per month.

Plaintiff contends that the ALJ erred in relying on Dr. Kirby's treatment notes that predate "subsequent injuries to [Plaintiff's] neck in August 2010 and a motor vehicle accident in June 2011 [that] further exacerbated his cervical spine issues." (Doc. 15 at 15.) Some of the treatment records on which the ALJ relied, however, were dated as late as September 19, 2011—after Plaintiff's alleged injury in August 2010 and his motor vehicle accident on June 26, 2011. (*See* AR 17 (citing AR 603 (Dr. Kirby's treatment records dated March 21, June 20, and September 19, 2011).) To the extent that Plaintiff suggests Dr. Kirby's treatment records are actually consistent with the expected absences limitation found by Dr. Kirby (*see* Doc. 17 at 2), this Court will not second guess the ALJ's reasonable determination to the contrary, even if such evidence could give rise to inferences more favorable to Plaintiff. *See Robbins*, 466 F.3d at 882 (citation omitted).

In sum, substantial evidence supports the ALJ's finding that Dr. Kirby's treatment notes showed that, despite his pain, Plaintiff's pain medication regimen enabled him to remain active and independently perform activities of daily living, which is entirely inconsistent with the severe limitation he assessed.[7] This inconsistency was a specific and legitimate reason for the ALJ to discount, in part, Dr. Kirby's assessment. *See Bayliss*, 427 F.3d at 1216; *Rollins,* 261 F.3d at 856; *Connett*, 340 F.3d at 875; *Tonapetyan*, 242 F.3d at 1149.

### 3. The ALJ Erred in Failing to Cite a Specific and Germane Reason for Rejecting Nurse Practitioner Rico's Opinion.

Plaintiff contends that the ALJ improperly rejected the April 4, 2014 opinion of

---

[7] Indeed, impairments that can be controlled effectively with medication are not considered disabling. *Warre v. Comm'r of the SSA*, 439 F.3d 1001, 1006 (9th Cir. 2006).

Plaintiff's treating nurse practitioner Pamela Rico. (Doc. 15 at 15.) Nurse practitioners are defined as "other sources" in 20 C.F.R. § 404.1513(d)(1) and are not entitled to the same deference as other types of providers. *Molina v. Astrue,* 674 F.3d 1104, 1111–1112 (9th Cir. 2012) (citing 20 C.F.R. § 404.1527; SSR 06–03p). However, the ALJ is required to "consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987). If an ALJ disregards evidence from an "other source," the ALJ must provide reasons "that are germane to each witness." *Molina,* 674 F.3d at 1111–1112. *See also Turner v. Comm'r*, 613 F.3d 1217, 1224 (9th Cir. 2010). Further, the reasons "germane to each witness" must be specific. *Stout v. Comm'r*, 454 F.3d 1050, 1054 (9th Cir. 2006).

Nurse Practitioner Rico treated Plaintiff at Primary Care Consultants, Inc., beginning in November 2011. (AR 431–52, 457–62, 487–514, 522–549, 553–592.) Nurse Practitioner Rico physically Plaintiff examined 18 times and treated him for neck pain, back pain, anxiety, diabetes, hypertension, sleep apnea, and hyperlipidemia. (*See id*.) She prescribed Norco, Soma, Aspirin, Celexa, Remeron, Xanax, Glucophage, Benazepril, Mevacor, Gemfibrozil, Zithromax, and Percocet to treat Plaintiff's symptoms. (*See id.*) On April 2, 2014, Nurse Practitioner Rico opined that, in an 8-hour workday, Plaintiff could stand and walk less than 2 hours and sit less than 2 hours, and required a position that permitted shifting positions at will. (AR 622.) She opined further that Plaintiff could stand for 15 minutes at a time and sit for 45 minutes at a time, must walk from 10–15 minutes every hour, and would occasionally need to take 10 minute unscheduled breaks. (AR 622–23.) Plaintiff could occasionally lift and carry less than 10 pounds; rarely lift and carry up to 20 pounds; and occasionally twist, stoop, bend, crouch, and climb stairs. (AR 623.) According to Nurse Practitioner Rico, in an 8-hour workday, Plaintiff could reach overhead 50% of the time; reach in front 80% of the time; perform fine manipulation with the fingers 80% of the time with his left hand; and grasp, turn, and twist objects 80% of the time with his left hand. (AR 623.) Plaintiff was likely to be off-task 20% of the time, was capable of low stress work, and was likely to be absent from work due to his impairments or treatment more than four days per month. (AR 624.)

The ALJ gave "only partial weight" to Nurse Practitioner Rico's April 2, 2014 opinion, finding that it was "based on [Plaintiff's] subjective complaints," "overly restrictive," and there was "no real basis for the sit, stand, and walk limitations."[8] (AR 19.) Simply stating that Nurse Practitioner Rico's opinion was "overly restrictive" and had "no real basis" are not specific reasons for rejecting it. They are too general and not related to specific diagnoses, opinions, or observations made by Nurse Practitioner Rico. *See Bryant v. Colvin*, No. 15-cv-02982-JSC, 2016 WL 3405442, at *17 (N.D. Cal. June 21, 2016); *Sweetin v. Colvin*, No. 2:13-CV-03091-WFN, 2014 WL 3640900, at *13 (E.D. Wash. July 22, 2014).

The ALJ further erred in rejecting Nurse Practitioner Rico's April 4, 2014 opinion because it was purportedly based on Plaintiff's subjective complaints. Opinion testimony may be rejected if it is based on a claimant's subjective complaints that were properly discounted. *See Valentine,* 574 F.3d at 694; *Tonapetyan,* 242 F.3d at 1149. However, while the ALJ's negative credibility finding was not challenged by Plaintiff and appears to be supported by substantial evidence[9], there is no evidence that Nurse Practitioner Rico's opinion is based entirely on Plaintiff's subjective complaints. The objective medical evidence includes Nurse Practitioner Rico's treatment records detailing Plaintiff's 18 visits. (*See* AR 431–52, 457–62, 487–514, 522–549, 553–592.) It is reasonable to infer that after 18 treatment visits, Nurse Practitioner Rico's opinion was informed, at least in part, by her physical examinations, impressions, and recommendations, and perhaps other factors as well. Substantial evidence does not support the ALJ's assertion that Nurse Practitioner Rico's opinion is based only on Plaintiff's subjective complaints. *See, e.g., Poulin v. Berryhill,* No. 3:16-cv-05752-DWC, 2017

---

[8] These are the only reasons cited by the ALJ for her rejection of Nurse Practitioner Rico's opinion. (*See* AR 19.) Although Defendant now attempts to justify the ALJ's analysis by offering post-hoc rationale to support it (*see* Doc. 16 at 8), a reviewing court cannot affirm the denial of benefits based on a reason not stated or finding not made by the ALJ, and the Commissioner's after-the-fact attempt to supply an acceptable basis for the ALJ's decision is unavailing. *See, e.g., Pinto v. Massanari*, 249 F.3d 840, 847-48 (9th Cir. 2001) (an agency decision cannot be affirmed based on a ground that the agency did not invoke in making its decision); *see also Barbato v. Comm'r of Soc. Sec. Admin.*, 923 F. Supp. 1273, 1276 n.2 (C.D. Cal. 1996) (remand is appropriate when a decision does not adequately explain how a decision was reached, "[a]nd that is so even if [the Commissioner] can offer proper post hoc explanations for such unexplained conclusions," for "the Commissioner's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council") (citation omitted).

[9] In her opinion, the ALJ discounted Plaintiff's credibility, concluding that Plaintiff's statements were undermined by his activities of daily living (including taking care of his wife throughout his alleged period of disability) and by medical evidence in the record indicating that Plaintiff is functional on medication. (AR 17.)

WL 1055792, at *4 (W.D. Wash. Mar. 21, 2017) (finding that the ALJ's discounting of a nurse practitioner's opinion because it was based on Plaintiff's subjective complaints is not a germane reason where the ALJ failed to address the nurse's medical reports "evidencing her examination and observations of Plaintiff, his chronic pain, and whether [the nurse's] examinations and observations could serve as objective bases for her conclusions that Plaintiff suffers from severe pain and swelling requiring elevation."); *Muhammad v. Colvin*, No. CV-16-00799-PHX-BSB, 2017 WL 382510, at *8 (D. Ariz. Jan. 27, 2017) (finding that the ALJ's conclusion that a nurse practitioner's assessments were based on Plaintiff's subjective complaints was not a legally sufficient reason for discounting his opinions because the ALJ's conclusion was not substantiated by the record, in view of the "numerous treatment notes" in the administrative record). The ALJ therefore erred in evaluating Nurse Practitioner Rico's April 2, 2014 opinion. On remand, the ALJ must reconsider Nurse Practitioner Rico's opinion and, if again rejected, articulate specific and germane reasons to justify its rejection.[10] *See Molina*, 674 F.3d at 1111–1112; *Turner*, 613 F.3d at 1224; *Stout*, 454 F.3d at 1054.

**B.    The ALJ Properly Adopted the VE Testimony that Plaintiff Can Perform the Jobs of Leaf Tier and Ampoule Sealer.**

Plaintiff contends the ALJ improperly found that Plaintiff could perform the jobs of assembler, leaf tier, and ampoule sealer because there is a deviation between Plaintiff's RFC and the description of these positions in the DOT. Specifically, Plaintiff alleges that the ALJ's

---

[10] Plaintiff appears to suggest that Nurse Practitioner Rico is an "acceptable medical source" because she was supervised by Dr. Kathleen Baron. (Doc. 15 at 15; 17 at 3.) In the Ninth Circuit, a nurse practitioner may qualify as an "acceptable medical source" by working "closely under the supervision" of a doctor to the extent that she is "acting as an agent" of the doctor. *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996). In *Gomez*, the court relied on 20 C.F.R. § 416.913 regarding reports of interdisciplinary teams and determined that a nurse practitioner who worked in conjunction with, and under the close supervision of, a physician could be considered an acceptable medical source, but one working on his or her own was not an acceptable medical source. 74 F.3d at 970–71. Here, the extent of Dr. Baron's supervision appears as her electronic signatures on 12 of the 18 treatment notes signed by Nurse Practitioner Rico. (AR 493, 500, 507, 514, 529, 535, 541, 549, 559, 566, 572, 579.) Other than these electronic signatures, many of which were made *weeks* (*see* AR 500, 514, 529, 535, 572), and sometimes *months* (*see* AR 541, 549, 559, 579), after Plaintiff's treatment visits with Nurse Practitioner Rico, there is no evidence that Nurse Practitioner Rico worked closely with and was supervised by Dr. Baron. *Cf. Molina*, 674 F.3d at 1111–12. *See also Bain v. Astrue*, 319 Fed. App'x. 543 (9th Cir. 2009) (the ALJ need only provide germane reasons for discrediting the opinion of a nurse practitioner even though she consulted with a doctor every two weeks and participated in a peer-supervision group with the doctor, which was not sufficient to meet the supervision requirement to be considered as an "acceptable medical source"). The Court, therefore, rejects Plaintiff's contention that Nurse Practitioner Rico is an acceptable medical source.

finding that Plaintiff's RFC limits him to "frequently" handling, fingering, and feeling (AR 15),
conflicts with the DOT descriptions for these jobs, which require, in the case of assembler,
"constant" handling, fingering, and reaching, and, in the case of leaf tier and ampoule sealer,
"frequent" handling, fingering, and reaching. (Doc. 15 at 17–18; Doc. 17 at 5–6.) Defendant
asserts that the ALJ properly relied on the VE's testimony because she confirmed with the VE
that the testimony was consistent with the DOT. (Doc. 16 at 8–9.)

The DOT is the Commissioner's "primary source of reliable job information" and
creates a rebuttable presumption as to a job classification. *Johnson*, 60 F.3d at 1434 n.6 (9th
Cir. 1995); *see also Tommasetti*, 533 F.3d at 1042. An ALJ may also seek VE testimony in
order to determine whether a plaintiff can perform any work. The ALJ relies on the DOT and
VE testimony to determine whether—given the claimant's RFC, age, education, and work
experience—the claimant "actually can find some work in the national economy." 20 C.F.R. §
416.966(e); *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015); *Valentine*, 574 F.3d at 689.
"When there is an apparent conflict between the [VE's] testimony and the DOT—for example,
expert testimony that a claimant can perform an occupation involving DOT requirements that
appear to be more than the claimant can handle—the ALJ is required to reconcile the
inconsistency." *Zavalin*, 778 F.3d at 846 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1153–54
(9th Cir. 2007)). An ALJ may not rely on VE testimony regarding the requirements of a
particular job without first inquiring whether the VE's testimony conflicts with the DOT.
*Massachi*, 486 F.3d at 1152–53. An ALJ's failure to inquire into an apparent conflict is
harmless where there is no actual conflict between the RFC and the DOT. *Ranstrom v. Colvin*,
622 Fed. App'x. 687, 689 (9th Cir. 2015) (citing *Massachi*, 486 F.3d at 1154 n.19).

To accept VE testimony that deviates from the DOT, the record must contain
"persuasive evidence to support the deviation." *Pinto*, 249 F.3d at 846 (quoting *Johnson*, 60
F.3d at 1435). "Evidence sufficient to permit such a deviation may be either specific findings of
fact regarding the claimant's residual functionality, or inferences drawn from the context of the
[VE]'s testimony." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997) (citations
omitted). If the ALJ fails to address the contradiction, then a "gap" exists in the record, and that

"gap" precludes the court from determining whether the ALJ's decision is supported by substantial evidence. *Zavalin*, 778 F.3d at 846.

Here, in adopting the VE's testimony, the ALJ identified three occupations, assembler (DOT 734.687-018), leaf tier (DOT 529.687-138), and ampoule sealer (DOT 559.687-014), that Plaintiff can perform considering his age, education, and RFC. (AR 20). The DOT defines assembler as a sedentary position that requires "[e]xerting up to 10 pounds of force occasionally;" a "negligible amount of force frequently . . . to lift, carry, push, pull, or otherwise move objects;" and handling, fingering, and reaching "constantly," *i.e.*, "2/3 or more of the time." 734.687-018 ASSEMBLER, DICOT 734.687-018. The DOT descriptions for leaf tier and ampoule sealer are similar to that of assembler, except that they require handling, fingering, and reaching "frequently," *i.e.*, "1/3 to 2/3 of the time." *See* 529.687-138 LEAF TIER, DICOT 529.687-138; 559.687-014 AMPOULE SEALER, DICOT 559.687-014.

Plaintiff correctly asserts that there is a conflict between his RFC and the DOT description for assembler. The ALJ assigned Plaintiff with a light RFC and limited him to "frequent" handling, fingering, and feeling. (AR 15.) At the hearing, the VE testified that Plaintiff could perform the job of assembler, and the ALJ did not question the VE regarding her testimony. (*See* AR 58.). The VE testified that her testimony in that respect was consistent with the DOT. (AR 59.) The ALJ then adopted the VE's testimony that Plaintiff could perform the job of assembler, stating it "was consistent with the information contained in the [DOT]." (AR 20). By fully adopting the VE's testimony without questioning the VE or giving specific support from the record, the ALJ failed to provide persuasive evidence to resolve the conflict. *See Johnson*, 60 F.3d at 1435. Accordingly, the ALJ erred in finding that Plaintiff could perform the job of assembler.

However, the ALJ also adopted the VE's testimony that Plaintiff could perform the jobs of leaf tier and ampoule sealer (AR 20), the DOT descriptions for which are *consistent* with the ALJ's RFC determination (AR 15). Leaf tier and ampoule sealer require frequent handling and fingering, which is in accordance with Plaintiff's RFC. (*Compare* DICOT 529.687-138 *and* DICOT 559.687-014 *with* AR 15.) Despite Plaintiff's assertions (*see* Doc. 17 at 6), the ALJ

assigned no limitation regarding Plaintiff's ability to reach objects. (AR 15). Thus, the VE's testimony that Plaintiff could perform the jobs of leaf tier and ampoule sealer did not deviate from the DOT. *See, e.g., Reese v. Astrue*, No. ED CV 11-540-PLA, 2012 WL 137567, at *7 (C.D. Cal. Jan. 17, 2012) (finding no conflict between the DOT and Plaintiff's limitations where ALJ's RFC determination contained no reaching limitations and VE testimony stated Plaintiff could perform jobs that require constant reaching). Accordingly, those alternative jobs are sufficient to meet the Commissioner's burden at step five.

The ALJ's error in failing to reconcile the apparent conflict between the job of assembler and the DOT was harmless because the record contains substantial evidence demonstrating that Plaintiff was capable of performing the DOT jobs of leaf tier and ampoule sealer, and those jobs exist in significant numbers in the national economy. (*See* AR 20.) Accordingly, Plaintiff has not met his burden to show that the error was harmful.

## VI.    CONCLUSION AND ORDER

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, VACATED and the case is REMANDED to the ALJ for further proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Brian Keith Randrup and against Defendant Nancy A. Berryhill, Acting Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **August 3, 2017**                    /s/ *Sheila K. Oberto*
                                    UNITED STATES MAGISTRATE JUDGE